AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Virginia

OCT 3 0 2017

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  1:17sw 733 |
| The real property and premises known as 1050 River Road, Stanley, Virginia | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
The real property and premises known as 1050 River Road, Stanley, Virginia

located in the _____Western_____ District of _____Virginia_____ , there is now concealed *(identify the person or describe the property to be seized)*:
firearms, ammunition, body armor, military-style equipment, and explosive materials and their precursors

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C.  § 2339B | Attempt to provide material support to a designated foreign terrorist organization |

The application is based on these facts:
See Attached Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Nicholas Caslen, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  _____10/30/2017_____

/s/
Theresa Carroll Buchanan
United States Magistrate Judge
*Judge's signature*

City and state:  Alexandria, VA

Theresa Carroll Buchanan, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

**UNDER SEAL**

OCT 3 0 2017

IN THE MATTER OF THE SEARCH OF )
PROPERTY AT 1050 RIVER ROAD, ) Case No. 1:17sw 733
STANLEY, VIRGINIA )

## Affidavit in Support of Application for a Search Warrant

I, Nicholas Caslen, after being duly sworn, depose and state as follows:

1. I was the affiant on the attached affidavit executed on August 11, 2016, in support of warrants to search the backpack, truck, phone, and locker of Nicholas Young. I incorporate that affidavit ("the August 11th Affidavit") here, as well as the Criminal Complaint Affidavit, which was incorporated into the August 11th Affidavit.

2. This affidavit is submitted in support of a warrant to search the real property and premises known as 1050 River Road, Stanley, Virginia. Based on the facts contained herein, there is probable cause to believe that at that location are firearms, ammunition, body armor, military-style equipment, or explosive materials or their precursors, related to Young's attempt to provide material support to a designated terrorist organization, in violation of 18 U.S.C. § 2339B.

3. The information contained in this affidavit is based on my personal knowledge, training and experience, as well as observations made during the course of this investigation, personal review of records, documents, and other physical evidence obtained during this investigation, including recorded telephone, audio, and in-person communications and information provided to me by FBI Agents and other government personnel with knowledge

relating to this investigation. Documents referred to herein are from summaries and draft translations; they are not direct quotes. Since this affidavit is submitted for the limited purpose of supporting the search warrant, I have not included every fact known to me concerning this investigation.

4. In addition to the information contained in the August 11th Affidavit and the Criminal Complaint Affidavit, I add the following:

A.    <u>Probable Cause Exists to Search for Firearms in Property Under Young's Control</u>

5. In August 2016, the FBI searched Young's residence on Heron Ridge Drive, in Fairfax, Virginia, pursuant to the warrant issued on the basis of the August 11th Affidavit. In the course of the search of that search, investigators seized explosives and components of explosives; approximately 19 firearms; 18,000 rounds of ammunition; 70 pieces of body armor; and 60 knives, daggers, and swords.

6. In December 2016, Young was indicted for attempting to provide material support to the Islamic State ("ISIS") and obstruction of justice. In essence, the indictment alleges that, to keep the government from learning that his friend ("Mo") had joined ISIS in November 2014 - - and that Young was still in regular contact with him - - Young tried to mislead the FBI in December 2015 about his contacts with Mo over the previous 18 months. The indictment further alleged that, in July 2016, Young attempted to send money to ISIS by transmitting gift card codes to an account that Young believed was controlled by Mo.

7. After Young was indicted, he moved to suppress the firearms, body armor, ammunition, and military style equipment seized pursuant to the search warrant, on the grounds that their seizure was outside the scope of the warrant. Judge Brinkema denied the motion to

suppress, and found that the allegations in the August 11th Affidavit and the Criminal Complaint

Affidavit were "sufficient to establish probable cause for officers to search and seize as potential

evidence "any and all firearms, ammunition, body armor, military-style equipment, or explosives

materials or their precursors" in Young's home, truck, backpack, and locker. *United States v.*

*Young,* Case 1:16cr00265, Dkt #91 ("Memorandum Opinion") at 22-23. Through this affidavit, I

seek to use much of the same information to obtain a warrant to search another location

controlled by Young (the residence at 1050 River Road in Stanley, Virginia).

B.      Young Inherited a House from his Grandfather

8.   In the course of the search of Young's residence, investigators found a letter to Young

from his sister, dated in September 2008. According to the letter, Young and his sister inherited

a house from their grandfather. In the letter, Young's sister reminded Young of their "commit-

ment to keep Grandpa's house in our name" as well as the need to obtain insurance and fix the

roof. According to Young's sister, "we really need to go there and clean it and make sure it is

kept nice. There is a lot we can do to maintain the upkeep of it. It is ours now, and it is only right

that we do these things to make sure it stays nice."

9.   Recordings obtained by subpoena of monitored telephone calls between Young (in

jail) and his sister after his arrest reflect discussions about their grandfather's house. For

example, on October 21, 2016, Young said that he was afraid that, if he were convicted at trial,

then their mother would sell his guns. Young told his sister that, to prevent his mother from

selling his guns, they "we could keep them at Grandma's and Grandpa's or Uncle Randall's."

3

C.     Young Inherited the House at 1050 River Road in Stanley, Virginia

10.  According to online real estate records of Page County, Virginia, Nicholas and his sister have paid property taxes since 2008 on the property located at 1050 River Road in Stanley, Virginia. As of October 16, 2017, a tax amount of $289.41 is due by Nicholas Young and his sister.

11.  On October 16, 2017, I visited the Clerk's Office of the Circuit Court of Page County, Virginia. While there, I learned that Young and his sister own the residence at 1050 River Road in Stanley, Virginia, with their uncle (who I believe to be the "Uncle Randall" referenced in the phone call of October 21, 2016, as referenced above, and who I will refer to herein as "Uncle Randall"). According to the Clerk's Office, they inherited the property from their grandfather, Alvin Young.

12.  Alvin Young died on May 4, 2007, and the probate records of Page County contain the terms of his will. According to the probate records, Nicholas Young and his sister were listed as Alvin Young's grandchildren. Also listed were Alvin Young's sons Willis Young and Uncle Randall.

13.  On October 17, 2017, an official in the Page County Clerk's Office explained to me that the property at 1050 River Road in Stanley, Virginia, was inherited by Nicholas Young and his sister, along with Uncle Randall. This was so, she explained, because Alvin Young (grandfather of Nicholas and his sister) bequeathed the property to his sons Willis Young (father of Nicholas and his sister) and Uncle Randall (uncle to Nicholas and his sister), but Willis Young predeceased Alvin Young. According to the records of Page County, the heirs of Willis Young were his son, Nicholas Young, of Heron Ridge Drive in Fairfax, Virginia, and his daughter, of

4

Alexandria, Virginia. Accordingly, as the heirs of Willis Young, Nicholas Young and his sister

inherited their father's share of the River Road property when their grandfather died. As a result,

with their Uncle Randall, they own the property at 1050 River Road in Stanley, Virginia.

D.    Young Owned Firearms that Were Not Seized from his Residence in 2016

14. In February 2017, the FBI executed a warrant issued by this court to search Young's

Facebook page. The results provided by Facebook revealed that Young posted several photos of

himself and an unknown masked child, shooting weapons in what appears to be a rural area.

Young posted the photographs into two albums on his Facebook page. The first album was

titled "Site of our future Micronation." This album contained four photos, uploaded on June 17,

2012, showing Young shooting two pistols and an AK-47 style assault rifle. Enclosed is one

photograph of Young shooting the two pistols:



Based on my examination of the photographs as well as the firearms seized from Young's

residence on Heron Ridge Drive in August 2016, I believe that one of the two pistols, as well as

5

the AK-47 style rifle, likely were seized during that search. One of the pistols, however, was a revolver of unknown make and model, and has not yet been found by the FBI.

15. The second album on Young's Facebook page was titled "Hunting Humans." This album contained five photos, uploaded between July 15 and 16, 2010, depicting Young and an unknown masked child holding guns in a field. Two of the photos depict Young in a camouflage hat and pants, wearing a T-shirt with was appears to be the logo of Young's Nazi SS re-enactment group, the 5 Kopani B 19 Panzergrenadier RGT, holding a rifle with a bi-pod. One of these two photographs is attached below:



Based on my review, I believe that rifle with the bipod that was held by Young in the photo above was not seized during the search of Young's residence on Heron Ridge Drive on August 3, 2016, and has not been found by the FBI.

16. During the course of the search of Young's residence on Heron Ridge Drive on August 3, 2016, the FBI uncovered a copy of an ATF Application for Tax Paid Transfer and

6

Registration of Firearm. According to the ATF form, ownership of an Advanced Armament Co. .22 caliber suppressor with serial number EL-0681 was transferred to Young on July 5, 2010. This .22 caliber suppressor was not found during the search of Young's residence on August 3, 2016. A "suppressor" is another term for what often is known as a "silencer." A "suppressor" or "silencer" is regulated as a firearm, even though by itself, it cannot shoot a bullet.

17. In September 2011, the FBI executed a covert court-authorized search of Young's residence on Heron Ridge Drive in Fairfax, Virginia. During this covert search, Young's firearms were photographed. Based on my examination of those photographs as well as the firearms seized from Young's residence on Heron Ridge Drive in August 2016, I believe that at least four pistols and three rifles that Young possessed in September 2011 were not seized in August 2016, and have not yet been found by the FBI.

18. For ease of reference, the firearms and suppressor/silencer that was not seized from Young in 2016 even though he possessed them between 2010 and 2012 will, in the remainder of this affidavit, be referred to as "the Missing Firearms." It is possible that at least some of the Missing Firearms were lawfully transferred by Young to others before the search of his residence was executed in August 2016. In a recorded jail call with his sister on August 29, 2016, Young said that he had sold some guns between 2011 and 2013. On the other hand, during the search of Young's residence in August 2016, the FBI found documents reflecting Young's purchase of individual firearms, but none reflecting his sale of any. I know that it is it typical for the seller of a firearm to retain a record of the sale, if for no other reason than to prove that he sold it in case it was later used in connection with a crime. \

7

E.  Young Likely Stored Guns at the River Road House

19.  UCE reported that, in February 2012, Young said that he (Young) and an associate would bury equipment and document its location on topographical maps so they would know where to find it.  On August 10, 2016, I interviewed "HH", a friend of Young's, and was told something similar.  During the interview, HH told me that Young invited him to go shooting, but HH did not accept the invitation.  HH said that Young told HH that he (Young) wanted to bury weapons in the Northern Virginia area in case "shit hit the fan", and Young would know where the weapons were.  HH did not know if Young ever buried weapons.  Young's conversations with UCE and HH reflect that Young stored firearms at locations other than at his residence on Heron Ridge Drive in Fairfax.

20.  In February 2011, UCE reported that, during a meeting at a restaurant that month with Young, Young told him that his (Young's) family owned property in Luray, Virginia.  Young told UCE that they (Young and UCE) should go to the property to shoot guns.  Young told UCE about a neighbor at this property who complained that some of the bullets were landing on the neighbor's roof.  UCE never went with Young to the property in Luray.

21.  In June 2017, I spoke with an individual to whom I will refer herein as "Tenant", who rented space and resided in Young's townhouse on Heron Ridge Drive in Fairfax, Virginia, from approximately 2007 until 2011.  Tenant said that Young once showed him a gun that Young claimed was a fully automatic pistol from Chechnya.  In the course of the search in August 2016 of the Heron Ridge Drive residence, investigators found foreign guns, but none that was fully automatic.

8

22.   In February 2017, my FBI colleagues spoke with an individual to whom I will refer herein "Friend".  For many years after they met growing up, Friend and Young were friends. Friend said that, when they were in high school, Young would take Friend to go shooting at Young's grandfather's farm.  In October 2017, I asked Friend where that farm was.  Friend first recalled that the property was in Luray, but then said that Stanley, Virginia, was more accurate. Friend said that, when they went shooting together years ago, they brought everything with them, and Friend did not remember if Young stored weapons at his grandfather's property.

23.   On October 16, 2017, I went to Stanley, Virginia, and visited the property located at 1050 River Road.  The residence located at 1050 River Road, Stanley, Virginia, is a single-family house on the west side of River Road in Stanley, Virginia, approximately 900 feet south of the intersection of River Road and Honeyville Road.  The residence is a two-story, weathered, white house with darker-colored shutters.  An entrance to the residence is visible on the south side of the building.  The front door of the residence on the west side of the property is set behind a porch which is lined with white, weathered pillars. A gravel drive way leads into the property on the north side. There are three outbuildings on the property; two open wooden structures on the east side, behind the residence, and a red wooden two-story structure on the north end of the property.

24.   The property at 1050 River Rd, in Stanley, Virginia, is approximately nine miles from Luray, Virginia.  Luray is the most well known location in the area.  As a result, when Young told the UCE about shooting at a family property in Luray, I believe that he was referring to his property located at 1050 River Road, in Stanley, Virginia.

9

25.  I further believe that the guns held by Young as depicted in the photographs on his Facebook page (or as described to Tenant) were not found in the course of the search of Young's residence, truck, and locker in August 2016, because he stored them at his property at 1050 River Road in Stanley, Virginia.

26.  Based upon the above facts (as well as those included in the August 11th Affidavit and the Criminal Complaint Affidavit), there is probable cause to believe that Nicholas Young attempted to provide material support to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B, and at the real property and premises known as 1050 River Road, Stanley, Virginia, is likely to be found firearms, ammunition, body armor, military-style equipment, or explosive materials or their precursors, that constitute evidence of that crime.

27.  Wherefore, I request the issuance of a search warrant pursuant to Rule 41 of the Federal Rules of Criminal Procedure.

FURTHER THIS AFFIANT SAYETH NOT.

Nicholas Caslen
Special Agent, FBI

Subscribed to and sworn before me on this   30th day of October 2017.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

THERESA CARROLL BUCHANAN
UNITED STATES MAGISTRATE JUDGE

10



IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| IN RE SEARCH WARRANTS | ) | |
| INVOLVING NICHOLAS YOUNG | ) | No. 1:16 sw 453 |
| | ) | |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Nicholas Caslen, after being duly sworn, depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), assigned to the

Washington Field Office, Joint Terrorism Task Force ("JTTF"). I have been an FBI Special

Agent since 2011, and worked on the JTTF in both Wichita, Kansas, and Washington, D.C. As

part of my duties, I investigate potential criminal and terrorism-related activities associated with

suspected Homegrown Violent Extremists. I have participated in numerous counterterrorism

investigations, during the course of which I have conducted physical surveillance, executed court

authorized search warrants, and used other investigative techniques to secure relevant

information regarding various crimes.

2. This affidavit is submitted in support of warrants to search the following locations or

things:

    a.    The contents of a backpack seized from Nicholas Young upon his arrest on August 3, 2016, including a black Casio Verizon G'z One flip-phone; and a black Amazon tablet model SV98LN;

    b.    One black 2003 Dodge Dakota pickup truck, bearing Vehicle Identification Number 1D7HG38N23S289168, and Virginia license tags WITNSME; and

    c.    One black AT&T ZTE GoPhone, found on a truck transporting Nicholas Young's 2003 Dodge Dakota pickup truck on August 3, 2016; and

     d.     Locker #45 at Franconia/Springfield Metropolitan Transit Police
Department's District 2 substation.

Based on the facts set forth in this affidavit, there is in these locations or things, evidence more

particularly described on Attachment A, of attempts to provide material support to a designated

foreign terrorist organization, in violation of 18 U.S.C. § 2339B.

     3. I am familiar with facts contained in the affidavit sworn to in this Court on August 2,

2016, by my colleague, FBI Special Agent David Martinez, in support of a criminal complaint to

arrest Nicholas Young. I adopt the facts contained in the Special Agent Martinez's affidavit

("the Criminal Complaint Affidavit") as true statements for this affidavit and incorporate them

here.

     4. In addition to the facts contained in the Criminal Complaint Affidavit, the information

contained in this affidavit is based on my personal knowledge and observations made during the

course of this investigation, personal review of records, documents, and other physical evidence

obtained during this investigation, including recorded telephone, audio, and in-person

communications and information provided to me by FBI Agents and other government personnel

with knowledge relating to this investigation.

     5. Since this affidavit is submitted for the limited purpose of establishing probable cause,

I have not included every fact known to me concerning this investigation. When I assert that a

statement was made by an individual, that statement is described in substance and in part, but my

assertion is not intended to constitute a verbatim recitation of the entire statement.

     6. In addition to the information contained in the Criminal Complaint Affidavit, I can

add that, on August 3, 2016, the FBI arrested Young at Washington Metro Area Transit

Authority Headquarters located at 600 5th St NW, Washington D.C., on the basis of the criminal



complaint and arrest warrant issued by this Court the previous day.   Young was searched

incident to arrest and, in his pocket was found a folded white piece of paper with the name of the

mobile messaging account provider and the account name for "Young's First MM Account" (as

referenced in Paragraph 49 of the Criminal Complaint Affidavit).

A.  The Contents of a Backpack

7.  At the time of his arrest, Young also had on his person a backpack. The backpack was

searched incident to arrest.  In the backpack, the arresting agents found a July 23, 2016 receipt

from an electronics store in Fairfax, Virginia, for the purchase of ten gift cards (the gift cards

were marketed through the same internet service provider that was described in Paragraph 50 of

the Criminal Complaint Affidavit).  A FBI agent went to that electronics store identified in the

receipt, and obtained from that store another copy of that same transaction receipt.  The

electronics store also provided a copy of video surveillance from the store.  The surveillance

video appears to reflect Young in the store and purchasing the gift cards at the time reflected on

the receipt.

8.  Also in the backpack at the time of Young's arrest were an open but empty package

for an AT&T ZTE GoPhone; a black Casio Verizon G'z One flip-phone; and a black Amazon

tablet model SV98LN.  Neither the Casio Verizon G'z One flip-phone nor the Amazon tablet

bore an observable serial number on its outside case.

9.  After Young's arrest, Young requested that the agents power-off the cell phone, but

the agents declined his request.  Based on my knowledge and experience, I know that once cell

phones are turned off, many require a pass code in order to be operated again.  Based on Young's

sophistication with electronic devices (as described in the Criminal Complaint Affidavit), I

3



suspect that Young's request to power off his cell phone was motivated by his desire that the

phone be turned off so that the FBI would not subsequently be able to unlock it.

10.   Based on my knowledge and experience, I know that tablets such as the one located

in Young's backpack are capable of running the mobile messaging application that Young used

to communicate with UCO2 as described in the Criminal Complaint Affidavit.   Moreover, as

explained in the Criminal Complaint Affidavit, there is probable cause to search electronic and

communication devices possessed and/or used by Nicholas Young.

B.   <u>One Black 2003 Dodge Dakota Pickup Truck</u>

11.   According to the records of the Virginia Department of Motor Vehicles, as of July

31, 2016, Nicholas Young, of 12737 Heron Ridge Drive, Fairfax, Virginia, was the registered

owner of a 2003 black Dodge Dakota pickup truck, bearing Vehicle Identification Number

1D7HG38N23S289168, and Virginia license tags WITNSME.

12.   On August 3, 2016, Young drove his 2003 Dodge Dakota to his place of employment

with WMATA at the Franconia/Springfield Metro Station. After Young's arrest, a Metro Police

K-9 officer and dog did a sweep of the exterior of the vehicle. The dog gave a positive alert for

hazardous material. The vehicle was subsequently prepared for transport atop a flatbed truck to a

secure location. Prior to transport, an inventory was taken of the contents of the interior of the

vehicle. In the inventory, investigators found one Kel-Tec .380 firearm, an empty magazine, six

hollow point rounds, and $1,065 in cash.

C.   <u>One black AT&T ZTE GoPhone</u>

13.   Young's Dodge Dakota pickup truck was transported atop a flatbed truck to a secure

location in Washington, D.C. FBI agents followed the transport vehicle and never lost sight of it

4



during the trip. Once the vehicle arrived at the secure location, the driver of the flatbed truck noticed and told FBI agents about a cell phone that was lying on the bed of the flatbed truck. Agents then found a black cell phone on the bed of the flatbed truck below (and between) the rear wheels of Young's Dodge Dakota. Agents collected the cell phone and identified it as a black ZTE cell phone with clear tape over its camera aperture. As noted above, agents searching Young's backpack upon his arrest found an open but empty package for an AT&T ZTE GoPhone.

14. As noted in the Criminal Complaint Affidavit, Young used "burner" phones for security purposes. Based on my knowledge and experience, an AT&T GoPhone is a prepaid phone that is readily used as a "burner" phone. Further, that phone can operate the mobile messaging account that Young utilized to communicate with UCO2.

15. Metro Police reviewed their security camera footage and provided a copy of the footage showing that on the day of the arrest, Young went to his vehicle and appeared to be handling something underneath his truck. I believe that the phone found on the tow truck was a phone used by Young and hidden underneath his Dodge Dakota, but dislodged in the course of the transport to Washington, D.C., from the Franconia Springfield Metro station.

D. Locker #45 at MTPD District 2 Substation

16. According to the Metro Transit Police Department, Young was assigned a locker at the Franconia/Springfield MTPD District 2 substation. On August 3, 2016, a Metro Transit Police officer showed FBI agents Young's locker, identified as locker number 45 on the second floor, inside the MTPD men's locker room. The locker is approximately six feet in height, two feet in width, and two feet in depth, and was secured by a combination lock. That same day,



Metro Transit Police opened the combination lock, and FBI agents replaced it with a different lock to safeguard the contents of the locker pending acquisition of a warrant to search that locker.

17.  When he was arrested at work, Young had on his person a receipt for the purchase of ten gift cards. As noted in the Criminal Complaint, however, Young sent 16 gift card codes. No receipt for the remaining gift cards was found in the course of the search of Young's residence that was conducted shortly after his arrest. As a result (and unless they have been destroyed or discarded), records of his purchase of the remaining six gift cards are likely to be in his locker or in his truck.

18.  Based on my knowledge, training and experience, as well as that of other agents assigned to this investigation from the FBI, I know that receipts and related records are often found in people's vehicles, as well as in their workplaces. In this case, these records include records relating to income, assets, and expenditures, and are likely to be relevant to Young's purchase of gift cards for transmission to CHS and ISIL in July 2016, as well as assets that he sought to send overseas in 2015. Such records are also likely to be relevant to his contacts with terrorist groups in the past, and his past travel or attempts to travel overseas to fight on behalf of terrorist groups.

19.  Based on my knowledge, training and experience, as well as that of other agents assigned to this investigation from the FBI, I know that these important records are often maintained in hard copy and/or digital form, such as on computers and other electronic devices. This application seeks permission to search and seize records that might be found in Young's tablet, phones, or other electronic devices. One form in which records might be found is stored



on the hard drive or other storage media of a computer or other electronic devices. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

20. I know that Young uses electronic devices and is sophisticated about computer matters. As described in the Criminal Complaint Affidavit, Young not only showed a pro-ISIL video to CHS on YouTube and later explained to CHS how to set up an email account that would be difficult to trace back to CHS, but also - - in his attempts to communicate with CHS - - actually communicated with UCO2 through a text message, through that email account, and later through a mobile messaging application. Young told UCO that Young used "burner" phones (as described in Paragraph 16 of the Criminal Complaint Affidavit), and appeared to use one such "burner" phone in order to transmit the codes from the gift cards to UCO2 last month; after all, he used two different accounts of the mobile messaging application in order to communicate with CHS's Mobile Messaging Account. In addition, as explained in Paragraph 21 of the Criminal Complaint Affidavit, Young told UCO that Young believed that the U.S. government was spying on Young through Young's electronic devices.

21. Moreover, as described in the Criminal Complaint Affidavit, Young spoke to FBI agents in September 2010; on that occasion, he told the FBI that he maintained a Facebook page. As described in the Criminal Complaint Affidavit, he also spoke to law enforcement authorities on June 1, 2015; on that occasion, he told the interviewing officers that he used an internet dating site. Further, in June 2012, a fellow officer in the Metro Transit Police who was then close

7

friends with Young told the FBI that Young regularly used the internet and blogged on websites that he visited.

22. Based on the information described above, there is probable cause to believe evidence will be found in Young's tablet, phones, and electronic media for at least the following reasons:

    a.    Based on my knowledge and training, I know that computer files or remnants of computer files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file op a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the storage medium that is not currently being used by an active file - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c.    Wholly apart from user-generated files, computer storage media- in particular, computers' internal hard drives - contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or

8

application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

23.   In light of these concerns, I request authority to seize the tablet, phones, electronic media, and associated peripherals that are believed to contain some or all of the evidence described in the warrant, and to search the hardware for the evidence described. I further seek authority to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers and other electronic media were used, the purpose of their use, who used them, and when.

## Conclusion

24.   The backpack, phone, and truck that I now seek to search are all now in the custody of the FBI in Washington, D.C. Pursuant to the USA PATRIOT ACT, enacted in October 2001, Rule 41 of the Federal Rules of Criminal Procedure now authorizes warrants to be issued by a Federal magistrate judge in any district in which activities related to terrorism may have occurred, for property outside the district.

25. Based upon the above facts (as well as those included in the Criminal Complaint Affidavit), there is probable cause to believe that Nicholas Young attempted to provide material support to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B, and that evidence of this crime, more particularly described on Attachment A, is likely to be found in the following locations and things:

    a.    The contents of a backpack seized from Nicholas Young upon his arrest on August 3, 2016, including a black Casio Verizon G'z One flip-phone; and a black Amazon tablet model SV98LN;

    b.    One black 2003 Dodge Dakota pickup truck, bearing Vehicle Identification Number 1D7HG38N23S289168, and Virginia license tags WITNSME; and

    c.    One black AT&T ZTE GoPhone, found on a truck transporting Nicholas Young's 2003 Dodge Dakota pickup truck on August 3, 2016; and

    d.    Locker #45 at Franconia/Springfield Metropolitan Transit Police Department's District 2 substation.

Wherefore, I request the issuance of search warrants pursuant to Rule 41 of the Federal Rules of Criminal Procedure.

FURTHER THIS AFFIANT SAYETH NOT.

_____

Nicholas Caslen
Special Agent, FBI

Subscribed to and sworn before me on this 11th day of August 2016.

_____/s/_____
John F. Anderson
United States Magistrate Judge
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A - ITEMS TO BE SEIZED

1. All records and documents, however maintained, that concern the international transfer of money or assets, or the procurement of any item that may have been involved in or in support of terrorist or violent acts, including photographs, correspondence, and safe deposit keys.

2. All records and documents, however maintained, referring or relating to identities or aliases of Nicholas Young.

3. All records and documents, however maintained, referring or relating to past travel or planned travel by Nicholas Young, including airline tickets, credit card bills, bank records, checks, itineraries, passports, and visas.

4. Any and all records, documents, invoices and materials that concern any accounts with any internet service provider;

5. All records, documents, and paraphernalia, however maintained, relating to ISIL/ISIS (or any of its aliases), other designated terrorist groups, or any individual or group engaged in terrorism or terrorist activity, or communications with or involving such groups and/or individuals.

6. All contact lists, however maintained (including but not limited to names, addresses, phone numbers, Internet accounts or usernames, photographs or other identifying information) of individuals associated with Nicholas Young and/or foreign terrorist groups.

7. All records and documents, however maintained, referring or relating to the purchase or use of gift cards, encryption programs, or applications that may be used for clandestine or covert communications.

8. All records and documents, however maintained, referring or relating to any storage facilities, safety deposit boxes, mailboxes, or other locations where any of the foregoing items may be located.

9. Any and all firearms, ammunition, body armor, military-style equipment, or explosive materials or their precursors.

10. Any communications or electronic device capable of storing any of the items to be seized, including but not limited to all cellular phones, smart phones, electronic data processing and storage devices, computers and computer systems, keyboards and other associated peripherals, Central Processing Units, external and/or internal drives, portable drives, external and internal storage devices such as magnetic tapes and/or disks or diskettes, together with system documentation, operating logs, software and manuals, passwords, test keys, encryption codes or similar codes that are necessary to access computer programs, and the stored contents of the items described in this paragraph, which may be searched for only the items listed above.

11

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

AUG 2 . 2016

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 1:16mj 355 |
| | ) | |
| NICHOLAS YOUNG | ) | |

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, David Martinez, after being duly sworn, depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), assigned to the Washington Field Office, Joint Terrorism Task Force ("JTTF"). I have been an FBI Special Agent since 2010. As part of my duties, I investigate terrorist activities. I have participated in numerous counterterrorism investigations, during the course of which I have conducted physical surveillance, executed court authorized search warrants and arrest warrants, and used other investigative techniques to secure relevant information regarding various crimes.

2. This affidavit is submitted in support of a criminal complaint charging Nicholas Young with attempting to provide material support and resources to a designated foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B.

3. I have personally participated in this investigation and have witnessed many of the facts and circumstances described herein. I have also received information from other law enforcement and government officials related to this investigation. The statements contained in this affidavit are based on my own observations, review of documents, recordings, and reliable information provided to me by other law enforcement officials.

4. This affidavit is being submitted for the limited purpose of obtaining a criminal complaint and arrest warrant. As a result, it does not include each and every fact observed by me or known to the government. This affidavit summarizes the content of certain recorded communications, which were recorded pursuant to the consent of at least one party to the communication. When I assert that a statement was made by an individual, that statement is described in substance and in part, but my assertion is not intended to constitute a verbatim recitation of the entire statement. When I assert that an event occurred or a communication was made on a certain date, I mean that the event occurred or the communication was made "on or about" that date.

I.    The Relevant Statute and ISIL

5. On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224. On May 15, 2014, the Secretary of State amended the designation of AQI as an FTO to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al Islamiyya fi al-'Iraq wa'sh'Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. Although the group has never called itself "Al-Qaeda in Iraq," this name has frequently been used to describe it through its history. On September 21, 2015, the Secretary added the following aliases to the ISIL listing: Islamic State, ISIL, and ISIS. To date, ISIL remains a designated FTO.

2

6. Pursuant to Title 18, United States Code, Section 2339B, it is unlawful for any person to attempt to provide material support or resources to an FTO.

7. Based on my training and experience, I know that: (a) Sunni extremists and others, who are not citizens or residents of Syria and Iraq, are traveling to Syria and Iraq to join ISIL and commonly enter Syria by crossing the border from Turkey; (b) foreign fighters from Western countries are traveling to locations in Turkey, including Istanbul, and then traveling to towns closer to the border where they enter into Syria to join ISIL; (c) Abu Baker al-Baghdadi is the current leader of ISIL; and (d) ISIL is also frequently referred to as ISIS (an acronym for the Islamic State of Iraq and al-Sham or the Islamic State of Iraq and Syria).

II.   Young, Chesser, Khalifi, and Libya

8. Nicholas Young is a United States citizen who resides in Fairfax, Virginia, and is employed as a police officer by the Washington Metropolitan Transportation Authority, where he has been so employed since 2003.

9. On September 12, 2010, FBI agents interviewed Young in connection with the arrest of Young's acquaintance, Zachary Chesser. Chesser had been arrested earlier in 2010 for attempting to provide material support to al-Shabaab, another designated FTO. During the interview, Young said that he was shocked by the charges. Young said that it would be Young's religious and personal duty to tell someone if Young became aware of terrorist activity.

10. On January 24, 2011, an undercover law enforcement officer ("UCO") reported on a conversation that UCO had with Young (while UCO was acting in an undercover capacity). Young said that he was wary of surveillance, and frequently took the battery out of his cell phone when he wants to go somewhere to talk. UCO reported that Young told UCO about an occasion

3

when Young aimed an AK-47 style rifle out of the window of his residence while Young was scanning for what he believed was law enforcement surveillance against him.

11. On February 28, 2011, UCO reported on another conversation with Young. UCO reported that Young stated that if he (Young) ever was betrayed by someone, that person's life expectancy would be greatly diminished. That same evening, Young told UCO that, if Young ever was betrayed, that person's head would be in a cinder block at the bottom of Lake Braddock. In a discussion about FBI surveillance, Young said "we" should pour gasoline on their cars and light them.

12. On March 10, 2011, UCO reported on another conversation with Young. UCO reported that Young said that Young used to torture animals when he was a child. UCO reported that Young said that Young despised the FBI, and that someone with Young's skills could attack an FBI establishment. UCO reported that Young said that firearms are not allowed to be brought into the federal courthouse in Alexandria, but described a method that Young could bring multiple guns into the courthouse undetected in order to distribute them to others inside.

13. UCO reported that, on March 21, 2011, he met with Young, Amine El Khalifi, and another individual, and spoke about the fundamentals of marksmanship.

14. UCO reported that, also on March 21, 2011, he shared a restaurant meal with Young and Amine El Khalifi. UCO reported that Khalifi said that Khalifi's Facebook page had been taken down because Khalifi posted mujahidin information on it. UCO reported that UCO and Young told Khalifi to be careful about his on-line posts, and that Chesser recently had been arrested for his posts on-line.

15. UCO reported that, also on March 21, 2011, Young said that he was angry with the FBI for contacting Young's family members and co-workers before speaking to him. UCO

4

reported that Young spoke about finding out where the FBI Special Agent who questioned him lived, and then kidnapping and torturing her. UCO reported that UCO doubted that Young seriously intended to act upon those words.

16. That same day, UCO reported that Young said that he was paranoid about cell phones, and he felt that the FBI was investigating him. Young said that he had several "burner phones," which I understand to refer to phones that can be used temporarily and then discarded and that are difficult to trace back to any particular user.

17. UCO reported that, on April 1, 2011, UCO and Young again shared a restaurant meal with Khalifi. UCO reported that Khalifi said that this life is just a test, and that Khalifi was not concerned with any worldly possessions. UCO reported that Khalifi spoke of how shaheeds (meaning martyrs; in this context, those who die while conducting violent jihad) are sent to the highest level of heaven. UCO reported that Khalifi said that Khalifi had a mission from Allah, but did not state what it was. Young said that one of the greatest shaheeds is a convert who eventually fights the kaffirs for the Muslims.

18. UCO reported, also on April 1, 2011, that Young said that he had recently received a moving violation for an illegal u-turn in Falls Church, but that Young did not tell the officer that Young was himself a police officer because Young feared that the traffic cop would check with Young's department and find out that Young had already called in and said that he was on duty when he was not. My FBI colleagues obtained a copy of the traffic citation that actually was issued to Young, and also the records of the Washington Metropolitan Transit Police Department that indicate that Young was scheduled to be on duty at the time that traffic ticket was issued.

19. UCO reported that, on April 4, 2011, UCO and Young again shared a restaurant meal with Khalifi. UCO reported that UCO told Young of UCO's concern for Khalifi that Khalifi

5

was posting mujahidin propaganda on Facebook. UCO reported that, in response, Young said that Young would never talk about the things that Young was going to do, and that people would find out what he was going to do after it happened. Young said that if law enforcement searched Young's home, they would have issues because Young was stockpiling weapons. Apparently indicating what actions he would take against law enforcement personnel who attempted to search his house, Young told UCO that is what amphetamines, ballistic vests and assault rifles were for.

20. According to an interview with the FBI on September 10, 2011, Young said that he had traveled to Libya twice in 2011 and had been with rebels attempting to overthrow the Qaddafi regime. Baggage searches conducted by Customs and Border Protection on his outbound travel revealed that Young traveled with body armor, a kevlar helmet, and several other military-style items. Young was searched upon his return after the May trip, and was found to have brought the body armor back with him. Young said that on his second trip, he was initially turned away at the Libyan border by Egyptian authorities, but that he then took a one-way flight to Tunisia, and made his way into Libya from there.

21. UCO reported that, on January 26, 2012, Young said that he was paranoid that the U.S. government was spying on Young through Young's electronic devices.

22. In February 2012, Khalifi was arrested and charged with attempting to use a weapon of mass destruction (an improvised explosive device) in connection with his attempt to detonate himself in the U.S. Capitol Building in Washington, D.C. That same day, the other individual with whom Khalifi and UCO discussed the fundamentals of marksmanship on March 21, 2011, was arrested for possession of a firearm by a convicted felon.

6

23. In a conversation recorded by UCO on February 26, 2012, Young said that Muslims should actively try to uncover the informants who led to Khalifi's arrest.

II.    <u>Young and CHS</u>

24. In 2014, Young met on about 20 separate occasions an FBI Confidential Human Source ("CHS"). CHS posed as a U.S. military reservist of Middle Eastern descent, who was becoming more religious and eager to leave the U.S. military as a result of having had to fight against Muslims during his deployment to Iraq.

25. As part of a conversation recorded by CHS on August 10, 2014, CHS told Young that CHS wanted to join ISIS. CHS stated that, based on what ISIS was doing right now, it was "becoming an obligation for us to go." When CHS asked, "how long can we stay and wait?" Young answered, "Exactly." Young advised CHS to watch out for informants, and not to discuss his plans with others. To minimize any suspicions on the part of law enforcement or Customs officials in the United States and Turkey that CHS was traveling to join ISIL, Young further advised CHS to sign up with a tour group through a travel agency, and not carry with him more than $10,000.

26. As part of a conversation recorded by CHS on September 11, 2014, Young again warned CHS against trusting people with knowledge of CHS's plans to travel to join ISIL. Young told the CHS that undercover personnel will make contact with a person of interest to law enforcement, assess them, and introduce them to other law enforcement personnel who investigate and ultimately make an arrest. Young described to CHS a specific type of recording device used by law enforcement to record conversations. Young also showed CHS a pro-ISIL video on YouTube.

27. As part of that same conversation recorded by CHS on September 11, 2014, CHS asked Young for Young's opinion on CHS's plan to join ISIL. Young told CHS that CHS was good to go, but that CHS should avoid putting any information on-line or communicating by email, because emails leave a trail for law enforcement to follow. Young advised CHS to reserve a hotel and keep a copy of the reservation to show authorities who might become suspicious of CHS's overseas travel.

28. As part of a conversation recorded by CHS on October 2, 2014, Young suggested that CHS contact representatives of ISIL through social media. Young recommended that CHS use a "burner" phone from wireless hotspots. Young suggested that CHS pack sturdy boots, socks, and cold weather gear for his trip to join ISIL. Young also recommended bringing sandals so CHS's feet weren't in boots all the time. Young warned that binoculars might raise suspicion, but getting a quality zoom camera could serve the same purpose. Young said that CHS could spend from a week to two months trying to get across the border from Turkey into Syria.

29. As part of a conversation recorded by CHS on October 9, 2014, Young reminded CHS that CHS did not need to join ISIL now. Young said that "either way you're not at the end of a plank, you have breathing room. It's a lot of responsibility in either case. There is no one with a gun to your head that is counting down."

30. As part of a conversation recorded by CHS on October 10, 2014, Young told CHS to trust no one, and reminded him about Chesser being sentenced for making postings on-line. On that same date, Young warned CHS to plan on getting stopped by authorities during his travels; Young advised CHS to remain calm and to stick to his story that he was traveling as part of a tour group, because the authorities would not know any different even if they acted as if they did.

31.  As part of a conversation recorded by CHS on October 17, 2014, Young repeated his advice to CHS that he should plan on being stopped and questioned by authorities, but that CHS simply should stick to his story that he was with a tour group for his vacation. As part of a conversation recorded by CHS on October 23, 2014, Young role-played with CHS what to say to the border authorities in Turkey, and advised CHS that, if he got questioned, he should ask questions about whether it was safe in Turkey, and say, "I am joining a tour and I make friends easily."

32.  As part of that same conversation on October 23, 2014, Young told CHS that when law enforcement discovers that CHS may have traveled to Syria, law enforcement authorities will look through CHS's phone records to see who CHS was in contact with. Young said that, in a couple of weeks, he would send CHS a text asking whether CHS was back from CHS's vacation yet; Young told CHS not to respond to that text because the text would be designed to be found by the investigators looking into who CHS was in contact with before CHS's overseas trip.

33.  As part of a conversation recorded by CHS on October 24, 2014, Young and CHS discussed what was planned to be CHS's imminent departure from the United States. Young reiterated his warning that CHS should avoid creating a trail on Facebook or Twitter that would enable the authorities to prove that he attempted to join ISIL. Young repeated that CHS was likely to be stopped and questioned by authorities during his travels, but that CHS also would be allowed to proceed so long as CHS stuck to CHS's story. As part of a conversation recorded by CHS on October 25, 2014, Young repeated the warning that CHS would not get in trouble unless CHS talked about or admitted his plans to join ISIL.

9

34.   As part of that same conversation on October 25, 2014, Young and CHS traveled to a FedEx Office store and set up email accounts for use in communicating only with each other once CHS made it to ISIL.  Young set up an email account with the address that I will refer to as Essakobayashi@xxxx.com, and CHS set up an email account with the address that I will refer to as V4Vendetta@xxxx.com.

35.   CHS then led Young to believe that CHS left the United States for ISIL, and later actually joined ISIL.  In reality, once CHS led Young to believe that CHS had reached ISIL, CHS had no further contact with Young.  All further communications between Young and CHS's email account were actually communications between Young and FBI personnel posing as CHS.  In the remainder of this affidavit, I will refer to the FBI personnel posing as CHS as "UCO2" (for Under Cover Officer 2).

36.   Consistent with the ruse that Young discussed with the CHS on October 23, 2014, Young sent a text message to CHS's cell phone on November 20, 2014, stating "Salam. Hope you had a good vacation.  If you want to grab lunch after jumma hit me up."  On this same date, UCO2 sent a message from the V4Vendetta@xxxx.com address  to Young at the Essakobayashi@xxxx.com address, indicating that CHS had reached ISIL, saying, "Essa, Salaam Alaykum. I made it to dawlah! Mashallah words cannot explain…."

37.   On December 17, 2014, video surveillance captured Young using a computer at a FedEx store in Fairfax, Virginia.  At that same time, UCO2 received through the V4Vendetta@xxxx.com address a message from Young at the Essakobayashi@xxxx.com address, congratulating CHS for making it to ISIL.  Young sent another email from the Essakobayashi@xxxx.com address to the V4Vendetta@xxxx.com account on December 24, 2014, describing for CHS how Young told some of CHS's friends that CHS had made it to ISIL.

38.   On January 9, 2015, UCO2 received through the V4Vendetta@xxxx.com account a message from Young's Essakobayashi@xxxx.com account, expressing Young's thanks that CHS was safe.  In his message, Young proudly referenced the murders of the staff of the Charlie Hebdo magazine in France that had occurred just days earlier:

> Glad to hear things are going well and that you are safe.  If you are unable to write or get injured perhaps you could give this email address to one of your commanders so someone on this side of the world knows your status . . . yeah, I can imagine they are monitoring communications as much as they can to try and cause harm to you all…well, if you are in a comfortable situation down the road and want to set something up to chat just let me know. Safety and security first though of course.:)  May Allah make it easy on you….Not sure if you got the news there yet…A couple brothers…were named in an assault on a french newspaper…Hopefully now people understand there are some lines you don't cross.

39.   Between February and July 2015, Young periodically used the Essakobayashi@xxxx.com account to exchange messages with the V4Vendetta@xxxx.com account that he believed was controlled by CHS.  Young asked CHS to notify Young if CHS encountered any of the mujahideen that Young served with in Libya in the "Abo Salem Suhada Brig."  Based on my training, experience, and knowledge of various terrorist organizations, I believe Young's reference to "Abo Salem Suhada Brig" was a reference to a militia group in Libya that has possible links to al-Qaeda and that is known as the Abu Salim Martyrs Brigade.

40.   On June 15, 2015, from Young's Essakobayashi@xxxx.com account, Young emailed CHS at the V4Vendetta@xxxx.com account a request that CHS ask CHS's commanders for advice as to how Young could move Young's money out of the United States.  Young explained that he needed the advice because "[u]nfortunately I have enough flags on my name that I can't even buy a plane ticket without little alerts ending up in someone's hands, so I imagine banking transactions are automatically monitored and will flag depending on what is

going on." Young emailed CHS again on June 26, 2015, repeating Young's request that CHS ask his commanders about "a more advanced way of sending money."

41. On March 21 and 22, 2015, Young participated during off-duty hours in a weapons training event provided by another Metro Transit Police Department officer. The officer observed Young bring a large amount of ammunition to the training, and operate Young's own firearms, including an Egyptian AK-47, a Kimber 1911 .45 caliber pistol, and an AK-47 AMD rifle. On June 11, 2015, the training officer stated that Young said that Young also owned a semi-automatic 5.45 variant AK-47 RPK, an 8mm Mauser rifle, and a World War II-era Russian Negant rifle. The officer reported that Young once told the officer that Young wanted to buy a crate of Negant rifles to hand out if things went bad.

42. On June 1, 2015, Young was interviewed at his residence by law enforcement regarding an allegation of domestic violence. In the course of the interview, Young described dressing up as "Jihadi John" for a 2014 Halloween party that he attended with a friend. Young said that, as part of his costume, Young stuffed an orange jumpsuit with paper to portray a headless hostage, and he carried that around with him throughout the party. Young also said he has dressed up as a Nazi before and collects Nazi memorabilia. Young showed a tattoo of a German eagle on his neck. Young agreed that he knew that ISIS is a terrorist organization.

43. On December 3, 2015, the FBI interviewed Young, ostensibly in connection with an investigation into the whereabouts of CHS. Young said that CHS had left the United States to go on a vacation tour in Turkey approximately one year ago. Young said that he last saw CHS in October 2014, and had had no contact with CHS since October 2014. Young stated that Young had hung out with CHS only about three to six times. Young said that CHS did not talk about anything specific related to Syria that stuck out in Young's mind. Young said that he knew of no

one in the United States or overseas who helped CHS cross the Turkish border into Syria. In response to a request for an email address at which CHS might be reached, Young said that the address was something like the name by which Young knew CHS (which was nothing like "V4Vendetta"), and named an internet service provider that was not the service provider for the V4Vendetta account through which Young believed that he had actually been in contact with CHS.

44. On December 5, 2015, the FBI again interviewed Young, at his residence in Fairfax, Virginia. Young again said that he believed that CHS had left the United States to go on a vacation tour in Turkey approximately one year earlier, and that Young was unaware of anyone that CHS could have spoken with for travel guidance or advice. Young said that he had expected to hear from CHS once CHS returned to the United States from his vacation, but that Young no longer had any contact information for CHS.

45. On January 14, 2016, UCO2 sent an email to Young through the Essakobayashi email address that Young had set up with CHS on October 25, 2014. Among other things, the message said that CHS's mother had been questioned about CHS's whereabouts. On February 17, 2016, Young responded to that message, sending an email from the Essakobayashi account to the V4Vendetta address. Young wrote that his reply had been delayed because he was being careful in his communications. Young wrote that Young, too, had been questioned about CHS by law enforcement in December 2015.

46. That same day, Young also responded to an earlier email that UCO2 had sent from the V4Vendetta account, dated November 15, 2015. In this reply, Young discussed, among other things, the Paris attacks that had occurred just days earlier (resulting in approximately 130

13

people killed and nearly 400 others injured), and how the attackers were misunderstood, and how this gave the West a taste of what Muslims face every day.

III.   Purchase of Gift Cards for Use by ISIL in Obtaining Mobile Messaging Software

47.   On April 18, 2016, UCO2 (posing as CHS) sent an email message from the V4Vendetta account to Young's Essakobayashi account, stating that Young could communicate securely with CHS in the future by using a particular mobile messaging application to contact a specific account CHS set up through that application.   For ease of reference, I will refer to the particular account that UCO2 specified as the account through which to contact CHS as "CHS's MM Account."

48.   On July 14, 2016, UCO2 received a message through CHS's MM Account from an account set up through that same mobile messaging application.   The message expressed a prayer that "the situation is better than the news portrays," and included the sender's statement that he should have access to the mobile messaging account daily.   As noted below, this message was sent by Young.

49.   On July 15, 2016, UCO2 received an email on the V4Vendetta account from Young's Essakobayashi account, ostensibly notifying CHS that "Salam alikom brother, I messaged you on the app…"   Inasmuch as (a) the address for CHS's MM Account had been provided by the FBI to no one other than Young; and (b) the message received by UCO2 on July 14, 2016, was the only message that CHS's MM Account had received (other than messages sent from the account provider or test messages from within the FBI), I know that the email that Young sent on July 15, 2016, was designed to ensure that CHS knew that the message received by CHS's MM Account the previous day was sent by Young.   For ease of reference, I will refer to the specific account used by Young on July 14, 2016, as "Young's First MM Account."

14

50.   On July 18, 2016, UCO2 responded to Young through Young's First MM Account.
UCO2 wrote that ISIL used mobile messaging accounts to talk to individuals in the West seeking
to join ISIL, and purchased the mobile messaging accounts through the use of gift cards
(provided by an internet service provider) purchased in the West.  UCO2 wrote that ISIL needed
help in obtaining more gift cards (that could be used to set up more mobile messaging accounts
to communicate with more individuals in the West seeking to join ISIL) because the individuals
in the United Kingdom who previously had purchased the cards for ISIL (and then sent the codes
on the back of the cards to ISIL) no longer were doing so.  UCO2 wrote that ISIL
used each mobile messaging account only one time, and that ISIL had only a few codes
remaining.  UCO2 wrote that, with only a few codes left, ISIL would be unable to set up
accounts for all of the individuals in the West who wanted to communicate with ISIL in order to
join it.  UCO2 wrote,

> If u can only send couple codes this okay we understand I would not be where im
> today without u and Allah.  May Allah swt reward our brothers in west and
> reward you for ur efforts.

51.   On July 21, 2016, UCO2 received through CHS's MM Account another message
from Young's First MM Account.  In the course of that message, Young wrote "Interesting about
the cards. Why were the brothers in UK told to stop?  Inshallah more codes will come your way.
Many sting operations and setups in this area."

52.   On July 28, 2016, UCO2 sent another message to Young's First MM Account,
explaining that the individuals in the United Kingdom stopped getting codes so they could save
for their travel to ISIL, and later they were brought to ISIL because their computer skills were
needed there.  UCO2 wrote that "we still trying to get more code cards from few contacts in west

15

but it difficult to trust anyone in the west anymore. Any codes u can get will helpful and allow us to help many make hijrah. Only need a few right now."

53. On July 28, 2016, CHS's MM Account received a message from a mobile messaging account that was *not* Young's First MM Account. The message included 22 sixteen-digit codes. The codes were accompanied by the message, "Respond to verify receipt . . . may not answer depending on when as this device will be destroyed after all are sent to prevent the data being possibly seen on this end in the case of something unfortunate." The codes were from gift cards through the internet service provider referenced earlier by UCO2 on July 18, 2016, and redeemed by the FBI for $245. For ease of reference, I will refer to the specific account used by Young on July 28, 2016, as "Young's Second MM Account."

54. On July 29, 2016, UCO2 sent a message to Young's First MM Account, stating "MashaAllah may Allah reward you for efforts. This will help the brothers from Sudan seeking to fight in path of Allh in khilafah."

55. On July 30, 2016, UCO2 received through CHS's MM Account a message from Young's Second MM Account, stating "Glad it came through. Getting rid of device now...fo real. Gonna eat the Sim card. Have a good day." UCO2 also received through CHS's MM Account a message from Young's First MM Account, stating "Allah bless you. Stay safe. Waalikom Salam."

## Conclusion

56. Based on the foregoing, there is probable cause to believe that, between in or about October 2014, and on or about July 28, 2016, in Fairfax County in the Eastern District of Virginia, Nicholas Young knowingly attempted to provide material support and resources to a

designated foreign terrorist organization, namely the Islamic State of Iraq and the Levant (ISIL), in violation of 18 U.S.C. § 2339B.

Wherefore, I request the issuance of an arrest warrant pursuant to the Federal Rules of Criminal Procedure.

FURTHER THIS AFFIANT SAYETH NOT.

David Martinez
Special Agent, FBI

Subscribed to and sworn before me on this 2nd day of August 2016.

/s/

Theresa Carroll Buchanan
United States Magistrate Judge

THERESA CARROLL BUCHANAN
UNITED STATES MAGISTRATE JUDGE

17